**SIGNED THIS: February 17, 2009**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SHAWN MICHAEL BUCKLEY and | ) | |
| TINA JANE BUCKLEY, | ) | No. 08-80409 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| THE NATIONAL BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 08-8063 |
| | ) | |
| SHAWN M. BUCKLEY and | ) | |
| TINA J. BUCKLEY, | ) | |
| | ) | |
| Defendants. | ) | |

### O P I N I O N

This matter is before the Court after trial on the Complaint filed by the Plaintiff, The National Bank (TNB), against the Defendants, Shawn Buckley (SHAWN) and Tina Buckley (TINA) (together, the DEBTORS) pursuant to Section 523(a)(6) of the Bankruptcy Code.

Other than with respect to SHAWN'S state of mind, the parties are largely in agreement as to what happened.  In May, 2005, SHAWN bought a used 2002 Harley Davidson motorcycle financed through a third-party loan.  In August, 2005, he refinanced the loan with TNB.  SHAWN and TINA both signed a Note and Security Agreement granting TNB a security interest in the Harley.  SHAWN testified that he knew TNB had a security interest and that he understood the purpose and effect of the security interest.  TNB's loan paid off the balance owed on the prior loan.

Through a mistake, TNB's security interest was never perfected through notation of its lien on the Certificate of Title.  Instead, the original Title was mailed to the DEBTORS identifying SHAWN and TINA as co-owners with the lienholder portion left blank, an indication, incorrect though it was, that the Harley was owned free and clear of any liens.  The DEBTORS retained the title and did not turn it over to TNB or advise TNB that they received it.

In June, 2006, SHAWN decided to buy a new 2006 Harley, which he did by trading in the 2002 Harley to the dealer for a trade-in credit of $11,000.00.  He did not solicit TNB's permission for the trade or otherwise make TNB aware of the transaction.  He admitted that he knew he still owed TNB an unpaid balance, and that he knew the trade was a violation of TNB's contractual rights.  He admitted he knew the trade would harm TNB by depriving it of its collateral, that TNB could no longer repossess the 2002 Harley, and that TNB acquired no rights in the 2006 Harley.  He financed the balance of the purchase price of the 2006 Harley with a loan from Central Bank to whom he granted a security interest in the new bike.

SHAWN testified that he continued to make payments to TNB because he "was afraid." SHAWN stated that he never intended not to pay off the TNB loan or to otherwise harm TNB. During closing argument, the DEBTORS' lawyer admitted the conversion of the 2002 Harley by SHAWN, but argued that the conversion was not willful or malicious.

TNB bears the burden of proving by a preponderance of the evidence that the exception to discharge applies. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). A conversion of property, which SHAWN admits occurred, is a sufficient injury to the property of another to satisfy that element of proof.

"Willful" means intent to cause injury, not merely the commission of an intentional act that leads to injury. *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Under *Geiger,* to prove nondischargeability of a debt under Section 523(a)(6), a plaintiff must show that the debtor actually intended to harm him and not merely that the debtor acted intentionally and he was thus harmed. *Id.* at 61-2. Injuries either negligently or recklessly inflicted do not come within the scope of Section 523(a)(6). *Id.* at 64.

In situations involving conversion of collateral, the injury is that the creditor's collateral was wrongly or improperly disposed of. *In re Russell,* 262 B.R. 449, 455 (Bankr.N.D.Ind. 2001). Whether or not the debtor intended that the secured creditor would go unpaid is beside the point. An intentional injury is established by proof that the debtor intended to improperly use the creditor's collateral and/or its proceeds for purposes other than payment of the debt that the property secured. *Id.*

3

"Malicious" means in conscious disregard of one's duties or without just cause or excuse; it does not require ill will. *In re Thirtyacre,* 36 F.3d 697, 700 (7th Cir. 1994). But it does require a consciousness of wrongdoing. *In re Stanley,* 66 F.3d 664, 668 (4th Cir. 1995). It is this awareness of wrongdoing, not merely the wrongfulness of the debtor's actions, that is the key to maliciousness under Section 523(a)(6). *Russell,* 262 B.R. at 455. To be malicious, the debtor must have either intended that his actions injure the creditor, or the debtor must have been aware that injury to the creditor would follow from the actions. *In re Jercich,* 238 F.3d 1202, 1209 (9th Cir. 2001), *cert. denied,* 533 U.S. 930, 121 S.Ct. 2552 (2001); *In re Madsen,* 195 F.3d 988 (8th Cir. 1999); *In re Jorenby,* 393 B.R. 663, 666 (Bankr.W.D.Wis. 2008) (an intentional conversion where the debtor knows that injury will result is equivalent to an act done in conscious disregard of one's duties or without cause or excuse).

Having admitted that the conversion of collateral injured TNB, the DEBTORS dispute only whether SHAWN'S trade-in of the 2002 Harley was willful and malicious. The evidence compels the conclusion that it was.

During the direct examination conducted by TNB's attorney, SHAWN acknowledged that he intended to and did trade-in the 2002 Harley to enable him to purchase the 2006 Harley. He admitted that he understood that TNB had a security interest in the 2002 Harley, that the purpose of the security interest was to protect TNB, and that he knew the terms of the Note and Security Agreement prohibited him from selling or transferring the bike without TNB's consent, which he did not seek. He admitted that he knew he still owed TNB a loan balance at the time of the trade-in, that he knew the

4

trade-in would result in TNB's loss of its rights in the 2002 Harley, that he knew it was wrongful and harmful to TNB, yet he did it anyway.

He testified further that he knew TNB could not repossess the 2002 Harley once the trade-in occurred and that he knew that TNB had no rights in the 2006 Harley. He granted Central Bank a purchase money security interest in the 2006 Harley. SHAWN'S consciousness of wrongdoing is corroborated by his testimony that after the trade-in, he continued to make loan payments to TNB because he "was afraid."

SHAWN'S testimony in response to questions posed by TNB's attorney is easily sufficient to establish that his actions were willful and malicious. SHAWN'S attorney attempted to rehabilitate him, to no avail. In response to a question from his own attorney, SHAWN testified that he never intended not to pay TNB. As indicated above, that intent is beside the point. SHAWN'S willfulness is established by his trading in the 2002 Harley, a deliberate act knowingly done in violation of TNB's rights. His maliciousness is established by his consciousness that TNB would be harmed by his actions.

Although not an issue raised by the DEBTORS, it should be pointed out that the failure to perfect TNB's lien does not affect the enforceability of the security interest as between the DEBTORS and TNB. *In re Little,* 225 B.R. 593, 595 (Bankr.D.S.C. 1997); *In re Sindic,* 44 B.R. 167, 172 (Bankr.E.D.Wis. 1984).

Based upon the evidence introduced at trial, the Court determines that SHAWN'S actions were willful and malicious within the meaning of Section 523(a)(6). TINA, however, did not testify at trial and no evidence was introduced regarding her knowledge of or intention with respect to the trade-in or her awareness of harm to TNB. Therefore, TINA is entitled to judgment in her favor.

Where a willful and malicious conversion of collateral is proved, the amount of the nondischargeable debt is determined by the lesser of (1) the value of the converted collateral at the time of conversion and (2) the remaining balance due the creditor on the underlying debt. *In re Afonica,* 174 B.R. 242, 247 (Bankr.N.D.Ohio 1994); *In re Mills,* 111 B.R. 186, 207 (Bankr.N.D.Ind. 1988). The evidence established that SHAWN received a credit in the amount of $11,000.00 for the 2002 Harley at the time of the trade-in, and a TNB officer testified that the loan payoff balance as of the bankruptcy petition date was $9,328.72. Since the value of the collateral exceeded the payoff balance, the full amount of the debt is determined nondischargeable as to SHAWN.

In its complaint, TNB also requests an award of reasonable attorney fees and costs of collection. There is no statutory provision entitling a successful creditor to reimbursement for attorney fees incurred in proving a Section 523(a) exception to discharge. *Matter of Sheridan,* 105 F.3d 1164, 1166-67 (7th Cir. 1997). Attorney fees may be recovered only to the extent permitted by contract or nonbankruptcy law. *Mayer v. Spanel Intern. Ltd.,* 51 F.3d 670, 677 (7th Cir. 1995). The Note and Security Agreement contains a fee-shifting provision whereby SHAWN agrees to pay "all reasonable expenses of collection, enforcement, or protection of [TNB's] rights and remedies under this Loan Agreement. Expenses include, but are not limited to, reasonable attorneys' fees, court costs and other legal expenses." Pursuant to this provision, reasonable attorney fees and costs incurred by TNB in this action are also nondischargeable as to SHAWN.

A bankruptcy court has the jurisdiction to enter a money judgment for a claim found to be excepted from discharge. *Matter of Hallahan,* 936 F.2d 1496, 1507-08 (7th Cir. 1991).

But that jurisdiction is exercised in the court's discretion and the court may opt to simply determine that a debt is nondischargeable without determining or entering a money judgment in a specific amount. *In re Chan,* 2008 WL 5428271 (Bankr.E.D.Pa. 2008).

In this case, the DEBTORS dispute the balance due alleged by TNB. They question the charges for force placed insurance and the continued accrual of late charges despite an agreement by TNB to accept payments of $90.00 per week with an extension fee charged and paid on November 7, 2006. A payment history was admitted into evidence as Plaintiff's Exhibit #6 showing a principal balance due on February 19, 2008 of $8,987.73. An account summary was admitted as Plaintiff's Exhibit #7 that shows a net payoff balance of $9,396.54 as of March 4, 2008 and a principal balance of $9,047.60. The inconsistency between the principal balances stated on Exhibits 6 and 7 was not explained to the Court's satisfaction. Moreover, no testimony was offered as to the applicable per diem interest accrual to be applied to the principal balance.

Based on the evidence adduced at trial, the Court is unable to resolve the disputed issues of fact relating to the balance due on the loan. Rather than speculate, the better avenue is simply to leave the issue for the parties to address and perhaps settle by agreement. If no consensual resolution is reached, the issue may be brought before the state circuit court. In addition, no evidence of TNB's fees or costs was offered at trial, so no award of fees and costs may be made on the record before this Court. That issue may also be settled or raised in state court. For these reasons, the judgment in favor of TNB will be limited to a determination of nondischargeability as to SHAWN.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###